Good morning, Your Honors. May it please the Court, my name is T.J. Mills. I work with the United Methodist Committee on Relief. I'm here on behalf of the petitioner, Mang Au Kup. He's a Burmese asylum seeker. This is an immigration case. Mr. Kup is a Chin, of the Chin ethnic group. He's also a member of the Seventh-day Adventist Church. And his claim is based on his religious activities and also his membership in the United Methodist Church. Since this Court is reviewing the immigration judge's decision as the final agency decision, we're reviewing, or you're reviewing, the immigration judge's decision for substantial evidence. This Court may reverse only if the evidence is so compelling that no reasonable fact finder could fail to find the record of fear of persecution. The first issue that I think is of most importance to the petitioner is whether the I.J.'s own findings and Mr. Kup's testimony in this case compel a reversal and a grant of asylum. The I.J. clearly found a pattern and practice of persecution and therefore should have found well-founded fear in this case. In fact, the I.J. and his decision in Administrative Record, page 81 and 82. Counsel, are these pattern and practice evidence of what? Discrimination on the basis of ethnicity or on the basis of religion? Your Honor, the immigration judge stipulated that there was a plethora of documents that confirmed the persecution and at times torture and killing based on ethnicity and the religious activities of Chinns in the Kachin and Chinn states. Okay. And where in the record is the finding of persecution on the basis of the ethnicity? The specific threats that go to the past persecution also inform well-founded fear in this case. I'm talking about ethnicity, not religion. Well, there's a mixture of both ethnic and religious persecution here. The Chinns are known for their close to 95 percent of the Chinn community in Burma are practicing Christians. And so there has been a pattern and practice of persecution towards both the Chinn and Christians. And based on their ethnic group, there's been a lot of forced porterage in Burma. Mr. Koop, in fact, was subject to forced porterage at one point. You made a statement that the I.J. specifically found a pattern of persecution on the basis of ethnicity. I'm simply asking you, where in the record is that finding? The finding is in the immigration judge's own statements, where he. Where can I find that in the record? It's administrative record, page 81 and 82. Page what, 81? Page 81. And then it flows over to page 82. The immigration judge stated, a plethora of documents confirm the harassment and persecution and at times torture and killing of individuals in Chinn and Kachin province. By the Burmese government as a result of the religious beliefs and activities of the primarily Christian people living in these areas. That's religious, but where is a finding of persecution based on ethnicity? The specific finding on ethnicity is entwined with my client's membership in the Chinn community and his practice, and his Christian practice. So this is the best you can point to as a finding based on ethnicity? The primary claim of my client is that he was persecuted based on his Christian activities. He also happens to be a Chinn, which is which primarily and they are primarily Christians. It might be more productive for you to concentrate your argument on the religious persecution. Yes, Your Honor. In fact, the immigration judge felt so confident of his knowledge of country conditions in this case, he actually prevented my client from testifying further about his own knowledge of persecution and his own knowledge of military persecution in Burma. On pages 129 and 130 of the administrative record, when my client was asked what he knew about the Burmese military, the judge actually interjected and said, I know about the Burmese military. I don't need to know what he knows about them. I can extrapolate what he says to compare it to known conditions. If there was no finding of pattern and practice persecution here based on Christian activity, then we believe it was legal error to prevent my client from testifying further about what he knew of the Burmese military. The second issue that we disagree with you regarding the pattern of practice, do you have an argument to make regarding persecution of your client individually? Yes, Your Honor. There were specific threats. Wait a minute. Getting back to that part of the record that you just read, I'm looking at it now, and that had to do with the Burmese military intelligence, which has not too much to do with this case. And that exchange, the I.J. ended up by saying, I don't need to know what he knows about them. I need to know what happened to them. Which is a fair statement, is it, in relation to a question about what do you know about Burmese military intelligence? That was the only point at which my client was asked about his own knowledge of the Burmese military. And it's possible he would have testified. Well, the military and the military intelligence are entwined. They are the same entity as far as asylum seekers go from Burma. Your Honor, the I.J. in this case improperly conjectured two grounds to deny asylum to my client. The first was his failure to apply for asylum at any foreign embassy in Malaysia, and the second were reauthorizations of his passport in Malaysia. There was no evidence in the record that my client, that there was an existence of an asylum program at any foreign embassy in Malaysia. Conjecture can never be. Was there an argument that the I.J. found past persecution? The immigration judge specifically found no past persecution. Okay. Why don't you tell us why that was wrong? How was there persecution? Your Honor, in the one incident that was considered by the immigration judge with regard to past persecution was an incident of forced porterage on one day in 1990. The events that were not considered by the judge, were not weighed with regard to past persecution, were specific threats that were made to my client in June 1995, the incidents that triggered his flight from Burma. His friend and colleague who practiced Christianity and was one of the leaders of the SDA community, who was killed, prior to his death he was tortured, he was killed, he was dragged through the streets as a message to other practicing Christians and Chins as to what would happen to them if they did the same. He fled from Mangkring to Luzang, his hometown in Chin, and then fled to Tunzang. Each time he heard that the military was actively hunting him down. He at that point fled to Rangoon and left the country. These are specific threats, and this Court has held that even specific threats without more, without actual physical harm, can form the basis for past persecution. We saw that in Salazar-Pakar v. INS 281F3-1069. In that case the petitioner was never harmed. He was a president of a local barrio committee in Peru. He received death threats through a third party, and this Court found past persecution. And even where past persecution is not found, where threats are as egregious as those suffered by my client, they at least inform whether he has a future fear of persecution. The judge didn't consider any of these possibilities. He did not consider these threats at all with regard to past persecution or future persecution. Your Honors, may I reserve the little time I have left for rebuttal? Yes, we'll give you a minute on rebuttal, all right? Thank you. May it please the Court, my name is Rena Curtis, and I'm here on behalf of the government in this case as the respondent. I would like to just go ahead and start with rebutting counsel's arguments. First, I'd like to point out to the Court that they're absolutely correct, that the IJ did not find a pattern in practice, especially with regard to ethnicity, and that that is not indicated on the administrative record on page 81. In fact, what he's Well, what's the import of that statement in the IJ's decision then? Yes, Your Honor, the import of that comment is really going to the credibility of the petitioner, and the judge is basically saying that, you know, it's his understanding from the records that are before him and the country reports and the documents that are submitted that this is the kind of action Just a minute. What the IJ says is respondent has also submitted a plethora of documents which confirms the persecution. Isn't that, I don't know if technically a finding, but isn't that virtually a finding that there's persecution? Well, I think what the judge is saying there, and you can see in the first sentence he's talking about, it goes to the issue of credibility, and the first issue he must look at is his credibility. And what he's saying later on is what you have to do to determine whether or not somebody is credible is look at the country conditions and look at the historical facts. So even though at some point in history there have been people who have been persecuted, it doesn't mean Well, that amounts to the same thing, because if he finds that it's credible and there's plenty of testimony about persecution, then, you know, isn't there persecution? There's credible testimony of persecution, and it's not rebutted. Yes, Your Honor. Well, actually it is rebutted in this case, but in addition to that, just because there has been persecution in the past does not mean that there's persecution in this case. Tell us how it's rebutted. Pardon? Tell us how it's rebutted. Well, first of all, a well-founded fear is rebutted because petitioner's family, who are Christians and who do practice, have been living there for at least, I mean, it's probably going on eight years now, but at the time it was five years. But were they similarly situated? Were they preaching? They actually weren't preaching, but they didn't have any problem practicing their faith, and they had never been contacted by any of the military. However, the petitioner himself did recognize that there were other preachers from his very organization, the Seventh-Day Adventist Organization, who were actively preaching in Burma at the time. And you can find that in the immigration judge's decision at 81. You can also find it in the administrative record at 152 and 144, that other preachers were actively preaching and that there were no other reports of persecution. Page 81, where does it say, oh, who is still conducting the same type of work? Well, you know what? Oh, here we go. Hold on. He indicates, it's the second paragraph down, he indicates as well that there are, according to his information, Seventh-Day Adventist Organization there in Guam, and that this organization is still continuing its activities in Burma and preaching their faith to those in these various towns. And that's on page 81 in the bottom of the second paragraph. And it's also in petitioner's testimony at 152 and 144. Ms. Curtis, if I might, we've talked about the IJ's comments at ER 81. Yes. That there was plenty of evidence of persecution of individuals in Chinonkechin province by the Burmese government. And then at 83, the court finds that the respondent himself, 83 toward the bottom, has not been the victim of past persecution because he hadn't been involved, there had been no persecution directly of him. Right. Now, the thing that concerns me in this case is the evidence that he meant and another person were apparently preaching in the village. The Burmese police interrupted that, I guess, and told them not to do any more preaching. I don't recall whether they took mint at that time, but I think he then preached again and they then caught him, tortured him, dragged him through the village, killed him. Then the Burmese police tell the villagers or the villagers report to Mr. Cup that the police are looking for him because he has continued to preach as well. Fearing for then that he's going to get the same treatment mint got, he leaves the country. Later on, he finds out, way into the future, that the third individual returned to Burma, was met at the airport apparently by the Burmese police, beaten or tortured and forced into the service in the army for the preaching that he had done. And that was one of the trio, that was the only. So isn't that rather compelling evidence that this person was threatened with torture and in fact death and fled the country because of those threats from the government on account of his religious preachings? Well, absolutely, that is a way that it could reasonably be interpreted. However, in this particular case, the immigration judge, as he was sitting there and absorbing all of this information, he was a reasonable fact finder and he determined otherwise. While it is very unfortunate that there was this incident, this incident. But he determined otherwise because Cup had not personally been tortured or mistreated. Right. I mean, that was it. He didn't look at or rather he rejected the concept that the treatment of Mint and the threats to Cup could constitute persecution. Well, I think the immigration judge actually did look to that and I think what he said. I think he did too and he concluded to the contrary. And there the question is, well, didn't that evidence compel a contrary finding than that made by the IJ? Right. And I think that it doesn't compel. And the reason is it didn't actually occur at the same time that the one incident that Petitioner did have, which was where he had to part the food for about 20 miles, which was awful, but it didn't rise to the level of persecution. This was a separate incident and Petitioner was not there. He didn't even observe it. There was no evidence on the record that this actually had anything to do with his religion. In fact, that's just the Petitioner speculating that it had to do with his religion. And I believe that what the immigration judge took from that is that it actually had more to do with his politics and that there was an indication that this particular preacher. Suppose he was persecuted for political reasons. Well, there's no evidence on the record that the Petitioner is involved in politics whatsoever. I mean, in fact, he denies that he has any affiliation with any type of political organization or that he. I think there was nothing that would indicate that Mint was involved in any politics either. Well, I think there was testimony from the Petitioner that indicated that he was tortured and killed because of his pro-democracy views, which was more a political persecution than it was a religious persecution. And I think the judge took that with the fact that there are other Seven-Day Adventists there preaching currently and the fact that this particular area is loaded with Christians and that they apparently, even though it's not as free, obviously, as in the United States to worship your God, that you can, in fact, worship your God and, you know, not be, you know, persecuted or killed for it. And additionally, I think that the immigration judge considered the fact that no one in the country, you know, allegedly it goes like this, that he was so afraid of going back because the Burmese government was actually hunting him down and they were trying to catch him. And I think the judge considered that, you know, if they really knew this guy's name and they were really trying to hunt him down, then they could have at least stopped by his family's residence and inquired, you know, about them or perhaps even persecuted his family, you know, to punish them for the fact that they thought he either had, you know, these religious views or these pro-democratic views and that his family was basically unmolested for at least five years on this record. And, you know, additionally, you know, this kind of goes to a separate issue, but I think this is the whole totality of the circumstances that the judge considered, was that once he was in Malaysia that he was actually able to renew his passport. Now, it doesn't matter, you know, petitioner brings up that, you know, well, the judge might have assumed that he actually went to court or went to the embassy himself and renewed the passport twice himself. Well, honestly, that point is completely irrelevant. The point is that in binding case law, it is reasonable to assume that if you can renew your passport, that the government is not actively seeking your death. And that would be found in Rodriguez-Rivera, which is the Ninth Circuit. Well, maybe the government is just, you know, happy to be rid of him, but if he goes back, that's another thing. I'm sorry, I don't understand your question. Well, see, the third member, and I don't remember his name, of the trio, went back and was tortured and forced into the military service. And he wrote a letter to Kup and told him about that. So the fact that the government doesn't molest or bother a person while he's in another country doesn't mean that the government's not going to do it if that person tries to return and indeed is exactly what they did to the third member of the group. Well, there definitely is evidence on the record that that occurred, but the I.J. did hear that evidence and he concluded otherwise. And so, you know, I think I would just have to tell you that as far as, you know, the record is concerned, there was only one incident of persecution which didn't or one incident that didn't rise to the level of persecution. And the immigration judge determined that there wasn't a well-founded fear of future persecution. All right. Ms. Curtis, you've exceeded your time. We appreciate your argument. You know, I have to say this is not a comment on you personally, but sometimes it's hard for me to understand the government's position. And sometimes I know you have to take hard cases. As far as I'm concerned, you know, Burma is one of the worst countries in the world as far as their human rights records are concerned. That's been our diplomatic policy for many years to changes in administration. We haven't had an ambassador there for many, many years because we don't want to recognize that country fully. And there are all kinds of reports, all kinds of cases of human rights abuses, religious abuses, ethnicity abuses. And as far as I'm concerned, if we can justify invading Iraq because Hussein is a bad man, the same justification would apply to Burma. You know, we could invade that country tomorrow under the same justification. Of course, we haven't done so because apparently it's not in our economic interest. But anyway, it's not a reflection on your advocacy, which is always been, I think, vigorous and in the interest of your client. Just my personal observation. Let's say any rebuttal. Just two comments, Your Honor. One, with regard to the respondent or the government's comment regarding how my client renewed his passport in Malaysia, it's clearly disguising conjecture, and that's what the judge did, as a reasonable finding in this case. The case is cited by the government for the notion that being able to renew or obtain a passport undercuts well-founded fear. In none of those cases was there any harassment or threats. None of the petitioners in those cases were harmed based on any of the grounds in the asylum statute, and none involved the renewal of a passport outside the country where, in this case, there was no evidence of what kind of communication even existed between the embassy and the military in Burma, and on what ground would they even want to arrest Mr. Coop abroad or be capable of arresting Mr. Coop abroad. In any event, the record contained evidence that dissidents are able to purchase passports at Burmese embassies abroad all the time, and that's cited in the record on AR-215 because of the rampant corruption that exists. Thank you, Your Honor. All right. Thank you. We thank both counsel for your argument. This case is submitted for decision. My next case on the argument calendar is Zara or Zara versus Ashcroft.
judges: Thompson, Tashima, Rawlinson